FULTON v. WILMINGTON STAR MIN. CO.

(Circuit Court of Appeals, Seventh Circuit.   October 11, 1904.)

No. 1,045.

1. MINING—LIABILITY FOR DEATH OF MINER—ILLINOIS STATUTE.

Under the coal mine law of Illinois (Laws 1899, p. 325, § 33), which makes a mine owner liable in damages for any injury to person or property or for death "occasioned by any willful violation of this act or willful failure to comply with any of its provisions," as construed by the Supreme Court of the state, a knowing and intentional failure to comply with the requirements of the act is a "willful" failure within its meaning, and a wrongful or evil intent is not necessary to give a right of action thereunder for the death of a miner.

2. SAME—CONTRIBUTORY NEGLIGENCE.

Under the decision of the Supreme Court of the state contributory negligence is not a defense to an action against a mine owner to recover for the death of a miner under the coal mine law of Illinois (Laws 1899, p. 325, § 33), and such construction of the statute is binding on a federal court.

3. SAME—LIABILITY OF OWNER FOR ACTS OF MANAGER.

The provision of the coal mine law of Illinois (Laws 1899, pp. 308, 309, §§ 7, 8) requiring all mine managers to obtain certificates of competency from a state board of examiners, and prohibiting mine owners from employing any person as manager who does not hold such certificate, does not exempt mine owners from liability for the defaults of their managers, nor does such construction render it unconstitutional.

Jenkins, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Northern District of Illinois.

P. C. Pegler, for plaintiff in error.

Wm. P. Sidley and Holt, Wheeler & Sidley, for defendant in error.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

GROSSCUP, Circuit Judge.   The action in the court below was to recover compensation for the loss occasioned to the plaintiff in error, by the death of her husband, Samuel Fulton, killed by an explosion of gas, January 27th, 1901, in the mines belonging to the defendant in error. The action was brought originally in the Circuit Court of Grundy County, Illinois, but was removed to the United States Circuit Court by the defendant in error, a citizen of the State of Wisconsin, the plaintiff in error being a citizen of Illinois.

At the conclusion of the plaintiff in error's testimony, defendant in error moved for a verdict, and thereupon a verdict was, by direction of the court, entered for the defendant in error.   To this ruling the plaintiff in error excepted; and on this is based the principal assignment of error.

The Wilmington Star Mining Company, at the time when Fulton lost his life, owned and operated two coal mines near Coal City, in Grundy County, Illinois.   The explosion occurred in the mine known as "Mine No. 6."   Into this mine two shafts extended, one used for hoisting purposes, and the other intended as an air shaft.   From the bottom of the former, four roadways diverged east, west, north and south, each running to the face of the mine, where the coal was being

excavated. There were in all, six or eight rooms, along and at the end of these roadways, in which the work of excavation was going on.

Fulton lost his life on a Sunday. The mine was not, on that day, in operation, and had not been worked during the preceding night. Fulton had descended on this Sunday, with one Wilson, the company's mine manager, to put in some switch tracks in the west roadway. Other men, by the direction of Wilson, were in the mine also, to put in some air boxes in aid of ventilation.

Fulton and Wilson descended together. The fan shaft had not been operated since about half past four the preceding afternoon. Wilson undertook to start the fan; but there being no means to turn the necessary valve, except by the use of monkey wrench, and a monkey wrench not being in the mine, Wilson ascended for that implement, and then came back; Fulton in the meantime remaining at the foot of the shaft.

Wilson knew that when the fan was not in operation gas gathered in the mine. He testifies that having started the fan, he told Fulton not to hurry up—to take his time, and let the fan clear out the gas— after which he, Wilson, "would run up with the lamp, and see what it was like." Having thus spoken, according to his evidence, Wilson went immediately into the south roadway, where the other men were at work, Fulton and one Schmitz proceeding to the point in the west roadway where Fulton's work was to be done. All at once, without warning, as Schmitz testifies, the explosion of gas occurred, Schmitz saving himself by throwing himself down, and covering his mouth with his hands. But Fulton was killed.

Plaintiff in error accepts Wilson's testimony to the extent that it shows that Wilson knew there was gas in the west roadway, but denies, and on the trial introduced evidence in our opinion tending to support such denial, that Wilson told Fulton to remain where he was. The insistence of plaintiff in error is, that the testimony of Schmitz taken by deposition, tended to show that Wilson ordered Fulton and Schmitz to go ahead, and not to wait. That testimony is as follows:

Edward Pierard's duty in the mine was to watch the gas, chase away the gas. I saw him go down that morning before I did.

Q. State whether Mr. Wilson, the mine manager, or Mr. Pierard, the fire boss, told you to wait and not go in the place where you were going with Sam Fulton with the car.

Objection by defendant as immaterial. Sustained. To which ruling of the Court, the plaintiff by her counsel then and there duly excepted.

Q. While you and Wilson and Fulton were at the bottom of the shaft before you pushed the car, did Mr. Wilson tell Fulton or you to wait until the gas was out?

Objected to by defendant as leading immaterial and incompetent on redirect examination. Objection sustained.

Q. What did Wilson say to Fulton? A. Boss no tell to wait, but told to go.

Q. State whether or not Wilson the boss said anything else to you and Fulton except to go?

Objection by defendant as immaterial.

Q. What statement, if any, was made to Fulton by Wilson?

A. Just tell me to go, that all.

Schmitz testifies further, that when he and Fulton started toward the west roadway, Wilson was so near the car, that Schmitz had to push him back with his hands, so the rails would not touch him.

It is not our province, on a record such as this, to determine whether Wilson told the whole truth, or only part of the truth—whether Wilson, knowing that under the circumstances gas would gather in the west roadway, asked Fulton to remain until the fan had removed it, or, or spite of that knowledge, ordered Fulton into the roadway at once. That is a question of fact for the jury. The question for us to determine is, whether assuming that Wilson ordered Fulton into the roadway when he knew, or ought to have known that gas had gathered there, the defendant in error was, notwithstanding, entitled to a verdict.

The act of the General Assembly of the State of Illinois, in force July 1st, 1899 (Laws 1899, p. 317, § 19), providing for the health and safety of persons employed in coal mines, provides among other things that "Throughout every coal mine there shall be maintained currents of fresh air sufficient for the health and safety of all men and animals employed therein, and such ventilation shall be produced by a fan, or some other artificial means"; also,

"For any injury to person or property, occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action should accrue to the party injured for any direct damages sustained thereby; and, in case of loss of life by reason of such wilful violation or wilful failure as aforesaid, a right of action shall accrue to the widow of the person so killed, his lineal heirs or adopted children, or to any other person or persons who were, before such loss of life, dependent for support on the person or persons so killed, for a like recovery of damages for the injuries sustained by reason of such loss of life or lives, not to exceed the sum of $5,000." Laws 1899, p. 325, § 33.

Plaintiff in error's declaration counts upon this duty of defendant in error to maintain, throughout the mine, currents of fresh air; and avers, that in the case of Fulton, it was wilfully violated; whereby a right of action for the loss of his life accrued to the plaintiff in error.

In Odin Coal Company v. Effie Denman, 185 Ill. 413, 57 N. E. 192, 76 Am. St. Rep. 45, the Supreme Court of Illinois had occasion to construe the statute of 1889, and the meaning to be given to the word "wilful" as used in that statute. The case grew out of a coal miner having been killed by falling down a shaft at the top of which the company had failed to maintain a sufficient light, as required by the act. Construing the word "wilful" as used in the portion of the act giving a civil cause of action, the court said:

"The appellant company stood charged with knowledge of the provisions of the law, and with the duty of complying therewith. * * * The omission was not through mere inadvertence, but was intentional. There was no evil intent operating to induce the failure, but that element is not a necessary ingredient of willfullness within the correct meaning of the word 'willful' as employed in this statute. As used in criminal and penal statutes, the word willful has frequently been interpreted to mean, not merely a voluntary act, but an act committed with evil intent, etc. The statute here involved is not a penal statute. The recovery awarded is not a penalty in the nature of a fine or a forfeiture, nor is it awarded as a punishment, but is confined by the express terms of Sec. 14 of said Chap. 93 to 'the direct damage sustained' by reason of the omission or failure of which complaint is made. Compensation for injuries inflicted—not punishment—is the ground of recovery. 'Willful' is a word of familiar use in every branch of law, and although in some branches of law it may have a special meaning, it generally as used in courts of law, implies nothing blamable, but merely, that the person of whose act or default the expression is used is a free agent and that what has been

done arises from the spontaneous action of his will. It amounts to nothing more than this, that he knows what he is doing, and intends to do what he is doing, and is a free agent. 29 Am. Eng. Ency. of Law, 113. An act *consciously* omitted is *willfully* omitted, in the meaning of the word 'willful' as used in these enactments of our legislature relative to the duty of mine owners. In Carterville Coal Co. v. Abbott, 181 Ill. 495, 55 N. E. 131, we said (page 502, 181 Ill., page 134, 55 N. E.): 'Where an owner, operator or manager, so constructs or equips his mine, that he *knowingly* operates it without conforming to the provisions of this act, he willfully disregards its provisions and willfully disregards the safety of miners employed therein.' "

Following this interpretation of the act, it is plain that the question of fact in the case was, whether Wilson, mine manager for the company, directed Fulton to remain where he was until the gas had been blown out, or whether, conscious at the time that the current of fresh air required by the statute was not then being maintained, Wilson directed Fulton, notwithstanding such condition, to go into the west roadway of the mine.

Counsel for defendant in error insists (a) that assuming that Wilson gave the direction claimed, Fulton having knowledge himself of the presence of gas in the roadway, was guilty of contributory negligence— even a wilful violation of the statute—in obeying the direction of Wilson; and (b) the company was not liable for the negligence or default of Wilson, because under the statute, the company had no choice in the employment of mine masters, except from those who had first passed a satisfactory examination as provided in the act of 1899.

Contributory negligence on the part of the injured, as an exemption from what would otherwise be the liability of the employer for injury caused by his negligence, is a rule of the common law; but a rule within the competency of the legislature to change. No question is raised but that in all actions for personal injuries the legislature might, if it saw fit, remove by statute, contributory negligence as a defense.

The act of 1899 is an Illinois act that has been construed by the Illinois Supreme Court. Under the authority of Carterville Coal Company v. Abbott, 181 Ill. 496, 55 N. E. 131, the act was intended to create civil liability to which contributory negligence, upon the part of the injured, would not be a defense. We might not, were the case here one of first impression, take the same view of what the legislature meant; but we feel ourselves bound to follow the construction given the statute by the Supreme Court of the state. All question of contributory negligence is thus taken out of the case.

Paragraph (d) Section 7, of the act of 1899 (page 308) provides:

"For Mine Managers. Persons coming before the board for certificates of competency as mine managers must produce evidence satisfactory to the board that they are citizens of this State, at least twenty-four years of age, that they have had at least four years of practical mining experience, and that they are men of good repute and temperate habits; they must also submit to and satisfactorily pass such an examination as to their experience in mines and in the management of men, their knowledge of mine machinery and appliances, the use of surveying and other instruments, the properties of mine gases, the principles of ventilation and the specific duties and responsibilities of mine managers, as the board shall see fit to impose";

and paragraph (e) of Section 8 (page 309) provides:

"Unlawful to employ other than Certified Mine Managers. It shall be unlawful for the operator of any coal mine to employ, or suffer to serve, as

mine manager at his mine, any person who does not hold a certificate of competency issued by a duly authorized Board of Examiners of this State: Provided, that whenever any exigency arises by which it is impossible for any operator to secure the immediate services of a certificated mine manager, he may place any trustworthy and experienced man, subject to the approval of the State inspector of the district, in charge of his mine, to act as temporary mine manager for a period not exceeding thirty days."

Because the selection of a mine manager is thus restricted to a class of men who have passed an examination—cutting off from employment by the proprietor, the whole body of the population who otherwise would be eligible—it is urged upon us, either that the legislature meant to exempt the employer from liability for the defaults of such mine manager, or that the act, to the extent that it compels a selection from such class, at the same time holding the owner liable for defaults arising therefrom, is unconstitutional; and in this connection Durkin v. Kingston Coal Co., 171 Pa. 193, 33 Atl. 237, 29 L. R. A. 808, 50 Am. St. Rep. 801; Homer Ramsdell Company v. La Campagnie Generale Trans-Atlantique, 182 U. S. 406, 21 Sup. Ct. 831, 45 L. Ed. 1155; Crisp v. The United States, etc., Co. (D. C.) 124 Fed. 748, and other cases, are cited. Some of these cases were under the pilotage laws, requiring that a ship nearing port, should take on the first pilot who hailed the vessel, or be liable for full compensation for such pilot. The ship master's choice was thus limited, not to a class, but to an individual. This difference creates a substantial distinction between those cases and the case under consideration.

The Pennsylvania cases we are unwilling to follow. The authority of Illinois is against them. Consolidated Coal Company of St. Louis v. Frank Seniger, 179 Ill. 370, 53 N. E. 733; Riverton Coal Company v. John E. Shepherd, 207 Ill. 395, 69 N. E. 921; as also the substantial considerations underlying the act. The Illinois act was passed under a mandate of the constitution of Illinois of 1870 (article 4, § 29), making it the duty of the legislature to pass laws for the protection of operative miners. It grew out of the public's wish that every precaution should be taken against the unusual hazards and dangers incident to the inhabitancy of mines. It was intended, and intended rightly, to protect with all known expedients, every person whose occupation required him to labor in these subterranean rooms and roadways.

The requirements imposed upon the owner are not unnecessarily numerous, strict, or otherwise burdensome. If it be not unreasonable, as certainly it is not, that mine inspectors, mine examiners, and mine managers be competent men, it is equally not unreasonable that they be able to prove by examinations as provided for, the possession of such competency. The restriction on the owner limits him, it is true, to selection from a class; but in practice, if the law be faithfully carried out, the class will include all the available men competent; so that, in its practical outcome, the act of 1899 simply requires that the owner's mine manager shall be a competent man, his competency to be determined according to standards fixed by the state authority; and within this area of proven competency—and the spirit of the common law gave no larger area—the owner is at liberty to employ and discharge as he chooses.

For the reason then that a question of fact, material to the issue and fairly presented by the evidence, was erroneously taken from the jury, the judgment below must be reversed.

· JENKINS, Circuit Judge (dissenting).   The cases of Carruthers v. Sydebotham, 4 Maule & S. 77, 85; Homer Ramsdell Transportation Company v. La Compagnie Generale Trans-Atlantique, 182 U. S. 406, 21 Sup. Ct. 831, 45 L. Ed. 1155; Crisp v. United States & Australasia S. S. Company (D. C.) 124 Fed. 748; Durkin v. Kingston Coal Company, 171 Pa. 193, 33 Atl. 237, 29 L. R. A. 808, 50 Am. St. Rep. 801; and Williams v. Thacker Coal and Coke Company (W. Va.) 30 S. E. 107, 40 L. R. A. 812—are distinguishable from the case in hand in this one respect: that by the terms of the statute laws there considered it .was obligatory upon the master to employ the servant for whose act he was sought to be held liable, while here the obligation to employ a mine manager or boss is not rendered obligatory by the express terms of the statute.   Is not, however, the distinction more imaginary than real?   By the act in question the Legislature was dealing practically with a practical subject, the operation of mines, known of all men necessarily to require the aid of men and in divers service.   Is it just to assert that the owner may himself serve as mine manager?   The same argument would hold with respect to hoisting engineer and others engaged in service about the mine.   The owner could not act in either capacity unless licensed by the state, subject to revocation at the discretion of the State Mining Board.   The mine owner, whether individual or corporation, desiring to use the property, could not possibly do it without employment of servants in the different departments specified in this act.   Practically, therefore, the act is an inhibition upon the owner to operate the property unless he employ men of the class selected for him and licensed by the state.   If the master is to be held for the act of his servant, he should have free choice in the selection of that servant.   Liability for omission of duty by the servant cannot rightfully be an incident of employment under compulsion.   The principle of law that justly holds one liable for the act of his agent within the scope of his employment implies voluntary action upon the part of the master in engaging the agent, and unrestrained choice in his selection.   Such unrestrained choice seems wanting here.

The mining cases cited differ from the one in hand in another respect.   There the statute provided that for an injury occasioned by violation of the act, or failure to comply with any of its provisions by the mine foreman, a right of action should accrue to the party injured against the owner or operator; touching which provision the Supreme Court of Pennsylvania said:

"This statute, regarded as a whole, is an extraordinary piece of legislation. Through it the lawmakers say to the mine owner, 'You cannot be trusted to manage your own business.   Left to yourself you will not properly care for your own employés.   We will determine what you shall do.   In order to make it certain that our directions are obeyed we will set a mine foreman over your mines with authority to direct the manner in which your operations shall be conducted, and what .precautions shall be taken for the safety of your employés.   You shall take for this position a man whom we certify to as competent.   You shall pay him his salary.   What he orders done in your

mines you shall pay for. If notwithstanding our certificate he turns out to be incompetent or untrustworthy you shall be responsible for his ignorance or negligence.' Under the operation of this statute the mine foreman represents the commonwealth. The state insists on his employment by the mine owner, and in the name of the police power turns over to him the determination of all questions relating to the comfort and the security of the miners, and invests him with the power to compel compliance with his directions. Incredible as it may seem, obedience on the part of the mine owner does not protect him, but, if the mine foreman fails to do properly what the statute directs him to do, the mine owner is declared to be responsible for all the consequences of the incompetency of the representative of the state. This is a strong case of binding the consequences of the fault or folly of one man upon the shoulders of another. This is worse than taxation without representation. It is a civil responsibility without blame and for the fault of another. The same conclusion may be reached by another road. It has been long settled that a mining boss or foreman is a fellow servant with the other employés of the same master engaged in a common business, and that the master is not liable for an injury caused by the negligence of such mining boss. Lehigh Valley Coal Company v. Jones, 86 Pa. 432; Delaware & Hudson Canal Co. v. Carroll, 89 Pa. 374; Waddell et al. v. Simoson and Wife, 112 Pa. 567 [4 Atl. 725].

"The duty of the mine owner is to employ competent bosses or foremen to direct his operations. When he does this he discharges the full measure of his duty to his employés and he is not liable for an injury arising from the negligence of the foreman. Waddell v. Simoson and Wife, supra. A vice principal is one to whom an employer delegates the performance of duties which the law imposes on him, and the employer is responsible because the duty is his own. As to the acts of the workmen and the manner in which they do their work, the duty of the employer is to employ persons who are reasonably competent to do the work assigned them, and, if he finds himself mistaken in regard to their competency, to discharge them when the mistake is discovered. But he is not responsible for the consequences of their negligence as these may affect each other. Ross v. Walker, 139 Pa. 42 [21 Atl. 157, 159, 23 Am. St. Rep. 166]. Now, the act of 1891 undertakes to reverse the settled law upon this subject, and declare that the employer shall be responsible for an injury to an employé resulting from the negligence of a fellow workman. Prior to the act of 1891 the man whose negligence caused the injury was alone liable to respond in damages. He might not always have property out of which a judgment could be collected, but the plaintiff must in any case take his chances of the solvency of the defendant against whom his cause of action lies. The act of 1891 undertakes to furnish a responsible defendant for the injured person to pursue. Passing over the head of the fellow servant at whose hands the injury was received, it fastens on the owner of the property on which the accident happened, and declares him to be the guilty person on whose head the consequences of the accident shall fall. To see the true character of this legislation we must keep both lines of objection in mind. We must remember that the injury complained of is due to the negligence of a fellow workman, for which the master is responsible neither in law nor morals. We must also remember that this fellow workman has been designated by the state, his duties defined and his powers conferred by statute, and his employment made compulsory under heavy penalties by the same statute. Finally, we must remember that it is the negligence of this fellow servant whose competency the state has certified, and whose employment the state has compelled, for which the employer is made liable. The state says: 'He is competent. You must employ him. You shall surrender to his control the arrangements for the security of your employés.' It then says in effect: 'If we impose upon you by certifying to the competency of an incompetent man, or if the man to whom we commit the conduct of your mines neglects his duty, you shall pay for our mistake and for his negligence.' We have no doubt that so much, at least, of section 8 of article 17 of the act of 1891 [P. L. 207] as imposes liability on the mine owner for the failure of the foreman to comply with the provisions of the act which compels his employment and defines his duties is unconstitutional and void."

The statute here in question imposes unusual and divers duties, not alone upon the owner, but upon the hoisting engineer and the mine manager or boss. The specific duties of each are detailed with exactness and care, and differ in quality. Clearly the purpose and inevitable result of the act is to compel the owner in the employment of his men to employ servants, and only such as should be licensed by the state. The management of the mine is most effectually taken out of the hands of the owner and committed to officers created by the state; none others being suffered to serve, under penalty. At common law the master is not liable for the default of the mine manager or boss, except for the latter's failure to perform a duty committed to him by the master, and which the law imposed upon the master, and which could not be delegated to the exemption of liability. These many novel duties are imposed by the act upon the mine manager or boss, and not upon the master. Considering the subject of the statute, the many peculiar duties imposed upon these employés, and how effectually the management of the mine is withdrawn from the owner, it would require precise language to convine me that the Legislature designed to impose liability upon the master for the neglect of duty by the servant, which was, by the statute, imposed upon the servant. I find no such language in this statute. It provides that "for any injury to person or property occasioned by any wilful violations of this act, or wilful failure to comply with any of its provisions, a right of action shall accrue to the party injured." I concede that the term "wilful," as here employed, means that the person charged knows what he is doing, and intends the act, and is a free agent, and that an act consciously omitted within the meaning of this statute is wilfully omitted. The act for which the defendant in error is sought to be charged was an omission by the mine manager or boss in the discharge of a duty imposed upon him by the statute, of which act the defendant in error had no knowledge and could not have been conscious. The servant had been licensed and certified by the state to be in every respect competent to perform the duty which the statute had created and imposed upon him. The master was compelled under penalty, if he employed any manager or boss in this mine, to employ one of the class so certified and licensed by the state. His duty to his employés in this regard was fully performed when he hired a person so certified and licensed. The statute does not in terms impose upon the master liability for such omission of duty by the servant. It is imposed upon the one who has wilfully failed to comply with the provisions of the act. The failure was in respect of a duty that neither by the common law nor by the statute in question was imposed upon the master. The liability by the statute is fixed upon him who has offended, who has been consciously derelict in duty, not upon him who has been compelled to employ the offender. I am unwilling to believe that the Legislature designed to impose such extraordinary liability. Thus, for illustration, by section 20d of the act (Laws 1899, p. 319) it is provided that "a miner who is about to explode a blast with a manufactured squib shall not shorten the match, saturate it with mineral oil nor ignite it except at the extreme end; he shall see that all persons are out of danger from the probable effects of such shot, and shall take measures to prevent any one approaching,

by shouting 'Fire' immediately before lighting the fuse." Will my brethren say that for failure of such duty by any one of the numerous miners employed, occasioning injury to a fellow servant, the owner is liable by this law? Has the whole doctrine of fellow servant and of master and servant been swept away by this statute; and is the master made a guarantor of the safety of all of his employés, and a warrantor of their acts? I think not. This action is under the statute, and not under the common law. It is to enforce the specific liability of the statute, and the cause must stand or fall according to the statute. I think the liability asserted is one imposed upon the offender, and not upon the master.

For the reasons stated I am constrained to dissent from the judgment of the court.

The judgment is reversed, and the cause remanded, with a direction to the court below to award a new trial.